# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TANYA MILLER,                                     Case No. 1:17-cv-633
      Plaintiff,                                Dlott, J.
                                                 Litkovitz, M.J.
      vs.


COMMISSIONER OF                                  **REPORT AND**
SOCIAL SECURITY,                                 **RECOMMENDATION**
      Defendant.


Plaintiff Tanya Miller brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's response in opposition (Doc. 17), and plaintiff's reply (Doc. 18).

## I. Procedural Background

Plaintiff protectively filed her application for DIB on July 5, 2012, alleging disability since February 25, 2008 due to Bipolar II Disorder, Post Traumatic Stress Disorder (PTSD), General Anxiety Disorder/Panic Attacks, and Chronic Depression. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Amelia G. Lombardo. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on May 8, 2014. On July 11, 2014, the ALJ issued a decision denying plaintiff's DIB application. This decision became the final decision of the Commissioner when the Appeals Council denied review on August 18, 2015. (Tr. 1-6). Plaintiff thereafter timely commenced a civil action, *Miller v. Commissioner of Social Security*, No. 1:15-cv-00678 (S.D. Ohio). The Commissioner filed a motion for

voluntary remand, which plaintiff opposed. This Court reversed the Commissioner's decision to deny DIB and remanded the matter under sentence four of 42 U.S.C. § 405(g) on July 21, 2016. (*Id.*, Docs. 21 and 22; Tr. 612-30). The Order directed the ALJ on remand to address the limitations assessed by the state agency reviewing psychologists; engage a medical expert to review all of the medical evidence and medical opinions; reassess plaintiff's residual functional capacity ("RFC"); reassess plaintiff's daily activities; and propose a new hypothetical to the VE which properly addressed all of plaintiff's limitations. (Doc. 21; Tr. 629).

On October 14, 2016, the Appeals Council vacated ALJ Lombardo's decision and remanded the matter for further administrative proceedings. (Tr. 652-55). A second administrative hearing was held on February 3, 2017, before ALJ Elizabeth A. Motta. (Tr. 513-61). Plaintiff appeared with counsel and testified at the hearing. A VE and a medical expert, Dr. Mary Buban, Psy.D., also testified at the hearing. On May 24, 2017, ALJ Motta issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act at any time between February 25, 2008, the alleged onset date, through March 31, 2014, the date last insured. (Tr. 483-506). Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy.   42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the sequential evaluation process.   *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).   Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.   *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security
Act on March 31, 2014.

2. The [plaintiff] did not engage in substantial gainful activity during the period
from her alleged onset date of February 25, 2008 through her date last insured of
March 31, 2014 (20 CFR 404.1571, *et seq.*).

3. Through the date last insured, the [plaintiff] had the following severe
impairments: degenerative disc disease of the cervical spine, bipolar disorder,
anxiety disorders (generalized anxiety disorder and post-traumatic stress disorder
(PTSD)), and a personality disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the [plaintiff] did not have an impairment or
combination of impairments that met or medically equaled the severity of one of
the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that, through
the date last insured, the [plaintiff] had the [RFC] to perform light work as
defined in 20 CFR 404.1567(b), subject to the following limitations: (1) lifting
and/or carrying up to 20 pounds occasionally and 10 pounds frequently; (2)
sitting, standing, and walking up to six hours each during an 8-hour workday; (3)
occasional postural activity, including climbing stairs and/or ramps, balancing,
stooping, kneeling, crouching, and crawling; (4) no climbing of ladders, ramps, or
scaffolds; (5) no exposure to hazards, such as dangerous machinery or
unprotected heights; (6) no exposure to vibration; (7) no more than occasional
overhead reaching bilaterally; (8) limited to simple, repetitive tasks that are
considered low stress, which is defined as work without strict productions [sic]
quotas or fast pace, and only routine, static work with few changes in the work
setting; and (9) limited to occasional contact with coworkers, supervisors, and the
public.

6. Through the date last insured, the [plaintiff] was unable to perform any past
relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1961 and was 52 years old, which is defined as

---

[1] Plaintiff's past relevant work was as an administrative clerk, a light, semi-skilled position which she performed at
a medium level of exertion.  (Tr. 504, 556).

an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from February 25, 2008, the alleged onset date, through March 31, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 488-506).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of the representative light unskilled jobs of merchandise marker (290,000 jobs nationally), router (55,000 jobs nationally), photocopy machine operator (17,000 jobs nationally), and garment folder (18,000 jobs nationally). (Tr. 505, 557).

(1938)).   Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).   In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.   *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.   Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."   *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).   *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.   Specific Errors

On appeal, plaintiff argues that the ALJ erred by: (1) failing to properly weigh the medical opinion of plaintiff's treating psychiatrist, Dr. Alice Onady, M.D.; (2) failing to adequately weigh the opinions of the state agency reviewing psychologists, Drs. Mary K. Hill, Ph.D., and Todd Finnerty, Psy.D.; and (3) improperly relying upon the testimony of the medical expert, Dr. Mary Buban, Psy.D.   (Docs. 10, 18).

### 1.   Weight to the treating psychiatrist's opinion

Plaintiff alleges as her first assignment of error that the ALJ erred in rejecting the opinion of her treating psychiatrist, Dr. Onady.

#### i.   *Treating physician standard*

It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers,* 486 F.3d at 242-43; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242-43.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2)[3]; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's

---

[3] These regulations were in effect until March 27, 2017, and therefore apply to plaintiff's claim filed in 2012. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.   *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).   This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of her case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule."   *Wilson*, 378 F.3d at 544.

"A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"   *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243).   *See also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) (remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and the ALJ's opinion does not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.).

Opinions from non-treating and non-examining sources are never assessed for "controlling weight."   A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c) (3)-(6); *Wilson*, 378 F.3d at 544.   Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides

supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

    *ii.   Dr. Onady's treatment records and assessments*

    Dr. Onady initially saw plaintiff on September 28, 2006. (Tr. 296-99). Plaintiff reported she had been diagnosed 2 1/2 years earlier with generalized anxiety disorder (GAD), panic attacks (PA), and "mind racing." She reported she had a "long [history] of bouts of depression" and she had used drugs and alcohol in the past. The intake form noted her sleep was very poor and she had decreased energy, concentration, and "psychomotor." Her current medications were Prozac, Klonopin and Xanoflex. On mental status examination, she was alert and oriented times 3, her appearance/behavior was neat and clean, cognition, insight and judgment were fair, and racing thoughts and poor sleep were noted. She reported no hospitalizations. Dr. Onady prescribed Xanax and Ambien. She assessed plaintiff with rule-out Bipolar II, GAD, and Panic Disorder and made a "deferred" diagnosis of alcohol abuse. Dr. Onady assigned plaintiff a Global Assessment of Functioning (GAF) score of 65.[4] (Tr. 299).

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with a score of 65 as only having mild symptoms or some difficulty with social, occupational or school functioning, but such a person can generally function fairly well and have some meaningful interpersonal relationships. DSM-IV-TR at 34.

An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Spencer v. Commr. of Soc. Sec.*, No. 3:16 CV 2724, 2018 WL 582412, at *9 (N.D. Ohio Jan. 29, 2018) (citing DSM V at 16) (American Psychiatric Ass'n, 5th ed., 2013)).

Plaintiff continued to treat with Dr. Onady following the alleged onset date of February 2008 and beyond the date last insured of March 2014. (Tr. 260-95, 320-395, 399-480; *see* 838-975, 1027-41). According to the record, plaintiff saw Dr. Onady monthly or bi-monthly from 2006 until January 2009, four times in 2010, and three times in 2011 and 2012 before resuming fairly regular bi-monthly visits with Dr. Onady in January 2013. (*See* Tr. 35-36; Tr. 260-99, 320-48, 349-95, 378-79, 399-480).[5]

In March 2008, plaintiff reported that she had been fired and felt sad but relieved. Her mood was dysphoric, affect was appropriate, content was hopeful, and process was linear. (Tr. 287). The plan was to continue her medications but decrease the Lamictal dose. In June 2008, plaintiff was still anxious about losing her job, her thought content was overwhelmed and anxious over finances, her mood was dysphoric, her affect was appropriate, and her thought process was linear. (Tr. 285). In September 2008, plaintiff was very stressed by financial problems, the lack of a job, and attending school. (Tr. 284). Her mood was dysphoric, her affect was appropriate, content was hopeful though she was anxious and worried about her son, and process was linear. In November 2008, plaintiff reported increased anxiety and depression due to a family issue and the stress of school. (Tr. 283). Her mood was dysphoric, her affect was appropriate, content was overwhelmed, and process was linear. In January 2009, plaintiff reported she had started school "for mental health recovery." (Tr. 282). Her mood was euthymic, her affect was appropriate, content was hopeful yet overwhelmed, and process was linear. In March 2009, plaintiff reported family stressors as her son and daughter-in-law were not getting along. (Tr. 281). Her mood was dysphoric, affect was appropriate, content was

---

[5] Several of the treatment notes included in the record are duplicates.

10

overwhelmed, and process was linear.   In June 2009, plaintiff reported she had graduated from

college and was looking for a job.   (Tr. 280).   Her mood was euthymic, her affect was

appropriate, content was hopeful and process was linear.   The plan was to restart Lamictal.   In

September 2009, Dr. Onady reported that plaintiff was "anxious [and] overwhelmed [with]

finances [and cannot] find a job [and was] in debt."   (Tr. 279).   Plaintiff's mood was dysphoric,

her affect was appropriate, content was overwhelmed and stressed, and process was linear.   In

April 2010, Dr. Onady noted that plaintiff was doing well except she was depressed about

finding a job and about conflict with her brother.   (Tr. 277).   At four visits between August

2010 and July 2011, plaintiff reported she was depressed or frustrated due to finances and not

working.   (Tr. 272-76).   In November 2010, Dr. Onady noted that plaintiff was also frustrated

with her family.   (Tr. 275).   In October 2011, plaintiff "report[ed] she is [very] dismayed by not

getting a job."   (Tr. 272).   On each of these dates, Dr. Onady indicated plaintiff had no

suicidal/homicidal ideation/plan and no medication changes were made.

After October 2011, Dr. Onady consistently indicated in her treatment notes for each visit

that there were no significant changes in plaintiff's mental status from the prior visit and she

made no mental status findings in the area designated in the treatment notes for those findings.[6]

(Tr. 260, 10/12/11; Tr. 262, 1/5/12; Tr. 264, 5/10/12; Tr. 266, 7/27/12; Tr. 332, 10/10/12; Tr.

378, 1/2/13; Tr. 394, 3/5/13; Tr. 365, 5/1/13; Tr. 447, 7/15/13; Tr. 467, 10/3/13; Tr. 408, 2/4/14).

Throughout this period, plaintiff reported stress and anxiety from job search efforts and financial

---

[6] It is not clear whether Dr. Onady included mental status findings elsewhere in her treatment notes.   Dr. Onady
sometimes noted that plaintiff's mood was dysphoric and anxious when setting forth plaintiff's self-reported
symptoms in her treatment notes, but it is not clear where plaintiff's self-reported symptoms end and Dr. Onady's
mental status findings, if any, begin.   *See*, e.g., Tr. 467 ("[Client] reports she has many current stressors with a
recent death of a family friend, still trying for disability, and worried about finances.   Mood dysphoric and anxious.
Plan continue meds as written.   No side effects noted."

11

concerns as well as family matters, and she reported insomnia. (Tr. 260, 10/12/11- plaintiff was very tired and stressed from trying to find a job, she was very discouraged, she was worried about her sister who might have cancer; Tr. 262, 1/5/12- plaintiff on Chantix and having a hard time sleeping, having racing thoughts, frustrated with not finding a job and financial stress; Tr. 264, 5/10/12- plaintiff very upset about losing a new job after 5 days and felt she was not given a chance to learn her tasks fully, also dealing with guilt from the past, mood sad but hopeful; Tr. 266, 7/27/12- plaintiff remained depressed and anxious, she had difficulty with sleep, and she was very irritated and isolative, her mood was depressed; Tr. 332, 10/10/12- plaintiff reported she was sad because she still was not working, her daughter was estranged, and her son was getting divorced, mood low but stable; Tr. 378, 1/2/13- plaintiff very upset about poor relationship with children and difficult finances, poor sleep, increased anxiety, depression and irritability; Tr. 394, 3/5/13- plaintiff very depressed about relationship with fiancé and stepfather's cancer, worried about finances, discouraged about not being able to work, very irritable and angry; Tr. 365, 5/1/13- plaintiff reported she was overwhelmed with stepfather's cancer and mother needing her, she was dealing with bankruptcy and her son's divorce, mood was dysphoric, irritable and hyperverbal; Tr. 447, 7/15/13- plaintiff reported she was traumatized by death of stepfather and accidental overdose of mother, mood dysphoric and anxious; Tr. 467, 10/3/13- plaintiff reported many current stressors with recent death of a family friend, still trying for disability and worried about finances, mood dysphoric and anxious; Tr. 408, 2/4/14- plaintiff reported having problem with stepbrother and dealing with ill mother and ill mother-in-law, feeling overwhelmed, mood dysphoric and anxious and she reported getting easily agitated).

Between October 2011 and the date last insured, Dr. Onady assigned several different GAF scores, ranging from 80 in April 2010 (Tr. 277) to 60 in August 2010 (Tr. 276), 45 in

November 2010 and March 2011 (Tr. 274-75), 55 in July 2011 (Tr. 273), and 45 in October 2011

and May and July 2012 (Tr. 270-72).[7]

Professional clinical counselor Joanne Turner completed a mental status examination on

June 17, 2013.   (Tr. 436-37).   She made the following findings: Plaintiff was well-groomed

with average eye-contact, clear speech, mildly slowed activity, and a moderately preoccupied

demeanor.   Plaintiff had reported no abnormal thought content, including phobia, obsessions,

preoccupation, or self-abuse.   She also had not reported any hallucinations.   Her thought

process was logical and her mood was moderately depressed.   Her affect was full and her

behavior was cooperative.   Plaintiff's attention and concentration were mildly impaired and she

was estimated to be of average intelligence.   Ms. Turner opined that plaintiff demonstrated

partial insight into her mental health symptoms, realizing that something was wrong but blaming

the problem on external circumstances at times.   Her judgment was good as she had the ability

to choose appropriate goals and adopt socially acceptable means to achieve them half of the time

depending on the situation.   Ms. Turner elaborated on the positive mental status findings by

noting: "[Plaintiff] was neat in appearance and well[-]coiffed.   Her session behavior was

cooperative.   Her level of consciousness was alert.   She was oriented to person, place and time.

Her flow of thought was logical."   (Tr. 436).

Dr. Onady completed a medical questionnaire in December 2012.   (Tr. 321-23).   Dr.

Onady reported that plaintiff presented with dysphoric and anxious mood, low frustration

tolerance, significant problems with concentration and focus, and difficulty retaining newly-

---

[7]  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers
or co-workers."   DSM-IV-TR at 34.   A GAF of 45 describes a person with "serious symptoms . . . or serious
impairment in occupational, social, or school functioning."   DSM-IV-TR at 34.

learned material, and she was oriented times three. Dr. Onady noted that there had been no formal IQ testing but plaintiff seemed to have difficulty retaining newly-learned materials, slow thought processes, and decreased frustration tolerance. Dr. Onady reported that plaintiff tended to isolate, had few friends, did not trust others, and rarely went out alone. She also reported that plaintiff had few outside interests and less interest in most activities as a result of her impairment. Dr. Onady stated that plaintiff had significant social and performance anxiety related to work and social situations. She opined that plaintiff could decompensate during perceived stressors such as a critical appraisal or a disagreement with a coworker. Dr. Onady opined that these symptoms had persisted since her teen years and that plaintiff's response to treatment had been "fair." Dr. Onady characterized plaintiff's ability to tolerate routine daily stressors and workplace stressors as "poor."

In June 2013, Dr. Onady and Ms. Turner completed a mental impairment questionnaire. (Tr. 396-98). They reported that plaintiff had been seen weekly for hour-long individual counseling sessions and monthly by Dr. Onady for pharmacological management. Plaintiff's GAF score at that time was 55, indicating moderate symptomatology. They identified symptoms of poor memory, sleep disturbance, mood disturbances, emotional lability, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, generalized persistent anxiety and hostility/irritability. They reported that plaintiff came to each session clean and neat and well-groomed. Her demeanor was usually preoccupied due to current stressors she was dealing with, which were the death of a close family member and financial concerns. Her activity level appeared slowed. Her attention and concentration demonstrated "some distractibility [and] problems with focus on topic at hand." Behavior therapy seemed to

14

address her coping with symptoms of anxiety and depression, and medications had helped her maintain a moderate level of stability. Recent stressors had "required more care." Plaintiff's prognosis for full-time work was "fair," and consistent treatment would help her maintain an acceptable level of stability for activities of daily living and functioning. Plaintiff's impulsiveness, agitation, memory issues and paranoia would make it difficult for her to sustain full-time, regular employment. Plaintiff's treatment and impairments would cause her to be absent from work more than three times per month. Plaintiff's functional limitations were assessed as follows: She was moderately restricted in activities of daily living; she had extreme difficulties in maintaining social functioning; she had marked difficulties in maintaining concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and she would experience marked episodes of decompensation at work. (Tr. 396-98).

The ALJ found that Dr. Onady's June 2013 opinion was not entitled to "controlling, deferential, or even significant weight." (Tr. 503). The ALJ gave the opinion only "some weight" to the extent Dr. Onady diagnosed multiple psychological conditions that affect plaintiff's mental functioning. (*Id*.). The ALJ rejected as unsupported by the record Dr. Onady's assessment that plaintiff was "extremely limited" in social functioning; that she had marked difficulties in concentration, persistence or pace; and that she would miss three days of work per month. (*Id*.). The ALJ also declined to give Dr. Onady's December 2012 assessment controlling or deferential weight. (Tr. 504). Instead, the ALJ gave the opinion only "some weight" to the extent Dr. Onady diagnosed depression and anxiety and opined that plaintiff experienced some difficulty with work-related mental functions. (Tr. 503-04). The ALJ found that Dr. Onady's opinion was inconsistent with the weight of the medical evidence and her own treatment notes for the same reasons stated in connection with the ALJ's evaluation of the June

15

2013 assessment. (*Id.*). The ALJ further found that despite plaintiff's subjective reports of increased stressors on occasion, Dr. Onady's treatment notes showed that plaintiff's overall condition had remained stable over time with no significant change in the nature, character or severity of plaintiff's mental impairments and no alteration or change in plaintiff's medication or treatment regimen. (Tr. 503). In discounting Dr. Onady's opinion, the ALJ also noted that Dr. Onady consistently found that plaintiff was oriented times three despite her mental impairment; that there was no assertion in Dr. Onady's records that plaintiff had experienced "significant performance anxiety issues related to work"; and that plaintiff had demonstrated a fair response to treatment.

Plaintiff argues that the ALJ erred by rejecting Dr. Onady's opinions because the ALJ completed only the first step of the analysis to be applied when evaluating a treating source's opinion. (Doc. 10 at 7-10). Plaintiff argues that the ALJ considered whether Dr. Onady's opinions were entitled to controlling weight but did not appear to go to the second step of the analysis and consider the additional regulatory factors to be balanced in determining what weight to assign her opinions. (*Id.* at 8-9, citing *Barbe v. Comm'r*, No. 3:13-cv-67, 2013 WL 6158404 (S.D. Ohio Nov. 25, 2013) (citing *Blakley*, 581 F.3d at 406)); *see also* Soc. Sec. Ruling 96-2p.

The Court finds that the ALJ did not err by improperly weighing Dr. Onady's opinions. First, the ALJ properly analyzed whether Dr. Onady's opinions were entitled to controlling weight by evaluating whether they were (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ found they were not entitled to controlling weight and explained the reasons for her finding. Those reasons are substantially supported by the evidence of record.

16

First, the ALJ found that Dr. Onady's treatment notes do not support the extreme and marked limitations Dr. Onady assessed in her June 2013 opinion.  (Tr. 503).  The ALJ's finding is substantially supported by the evidence.  The limitations Dr. Onady assessed are not consistent with the mental status findings in the record.  The records do not document notable difficulty with concentration, persistence or pace that was either observed by Dr. Onady or Ms. Turner, reported by plaintiff, or documented by testing.  To the contrary, Dr. Onady consistently documented that plaintiff's thought processes were linear and thought content was normal.  Nor do the records document several of the other symptoms noted in the assessment, including paranoia and agitation.  The lack of corroborating mental status examination findings is a valid reason to discount the treating psychiatrist's opinion.  *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics. . . .") (citing 20 C.F.R. §§ 404.1527; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

Similarly, Dr. Onady's treatment notes and other substantial evidence of record do not support Dr. Onady's findings of extreme limitations in social functioning.  The records show that plaintiff interacted with family members on a regular basis, she appeared to have a stable marriage, and she was a caregiver for relatives, including her stepfather over a period of several months.  In addition, plaintiff talked about friends in therapy (*see* e.g., Tr. 842, 4/24/14- plaintiff reported she lost a friend who provided haircare to her); she had completed coursework and obtained her college degree during the period of alleged disability; and she attended church (Tr. 504, citing Tr. 187-98).  The records indicate that plaintiff did not have a history of violence and

17

any interpersonal conflict revolved primarily around care for plaintiff's mother. (Tr. 503, citing Tr. 187-198).

Finally, the ALJ reasonably found Dr. Onady's opinion that plaintiff would miss three days of work each month appeared to be inconsistent with Dr. Onady's treatment records. Dr. Onady's treatment notes reflect relatively stable mental functioning from one visit to the next, and Dr. Onady did not explain the basis for this "rather drastic limitation" in her assessment. (*Id*.).

The ALJ also properly assessed Dr. Onady's December 2012 opinion for controlling weight. The ALJ found that Dr. Onady's treatment notes do not support her December 2012 opinion for the same reasons discussed in connection with the June 2013 assessment and because plaintiff's condition remained stable over time. (Tr. 503-04). The ALJ acknowledged that in the assessment, Dr. Onady reported clinical findings of dysphoric and anxious mood, low frustration tolerance, difficulty with concentration and focus, and difficulty learning new material. However, the ALJ noted that plaintiff was consistently oriented times three and her response to treatment was reportedly "fair," requiring no changes in the treatment regimen and very few alterations in her medication. (*Id*.). Although plaintiff reported being stressed due to job search frustrations, financial difficulties, and family matters, the treatment records do not reflect that plaintiff's underlying mental condition and mental functioning deteriorated significantly as a result of these stressors. The ALJ was not bound to give controlling weight to Dr. Onady's December 2012 assessment for these reasons.

Plaintiff argues that after declining to afford Dr. Onady's opinions controlling weight, the ALJ erred by failing to proceed to the second step of the analysis and to weigh the opinions using all of the regulatory factors in 20 C.F.R. § 404.1527(c). Plaintiff alleges that the ALJ did not

18

consider that Dr. Onady is a specialist who had a very extended treatment relationship with plaintiff and numerous opportunities to examine plaintiff.

The regulations require only that the ALJ's decision include "'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' - not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed. App'x 802, 804-05 (6th Cir. 2011). The ALJ complied with the regulations by acknowledging Dr. Onady's role as plaintiff's treating psychiatrist and considering whether her opinions were supported by the objective medical evidence and were consistent with the other evidence of record. (Tr. 491, 503-04). The ALJ found that Dr. Onady's assessments were entitled to only "some weight" to the extent she diagnosed depression and anxiety that affected plaintiff's mental functioning. The ALJ discounted the extreme and marked limitations Dr. Onady assessed in social functioning and concentration, persistence, and pace as inconsistent with the treatment plaintiff received, which consisted of therapy and medication management with few changes in the regimen and did not include any inpatient services over a ten-year period. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (records indicated that the claimant "received only conservative treatment for her ailments," which was a "good reason" for discounting a treating source opinion) (case citations omitted); 20 C.F.R. § 404.1527(c)(2) (the treatment the source has provided will be considered). The ALJ properly found that Dr. Onady's assessment of extreme limitations in social functioning and marked limitations in concentration, persistence and pace was not consistent with plaintiff's ability to complete her college coursework and obtain a degree during the period of alleged disability, or with her ability to function as a caregiver for her terminally ill stepfather and her mother. The ALJ also considered that while plaintiff's symptoms flared at times, the exacerbations appeared to be precipitated by situational stressors

such as family matters and financial issues. Despite these exacerbations of plaintiff's symptoms, Dr. Onady consistently indicated in the treatment records that there was no significant change in plaintiff's mental health status from one visit to the next.

Plaintiff argues that contrary to the ALJ's finding, Dr. Onady's opinion is supported by the treating providers' reports of agitation (Doc. 10 at 9-10, citing Tr. 293, 408, 863, 878, 923, 1032); frustration, anger or irritability (Tr. 262, 266, 326, 365, 378, 394, 891, 898, 901, 903, 906, 920, 928, 934, 1030); difficulties with focus or concentration (Tr. 1028); and changes in plaintiff's medications (Tr. 261, 263, 293, 325, 339-40, 379, 384). However, the cited records do not substantiate plaintiff's claims of error. Only one record that purportedly documents a mental status finding of agitation falls within the period of disability, and that record does no more than document plaintiff's subjective complaint that "she gets easily agitated." (Tr. 448, 2/16/14). Further, the cited treatment records document only one issue with concentration and focus in December 2015, which is well beyond the date last insured, and there do not appear to be any records during the period of alleged disability that report more than mild impairment in this area. (*See* Tr. 1028- thought process circumstantial but directable, memory/intelligence poor; *see also* Tr. 436, 6/18/13- demeanor moderately preoccupied, attention/concentration mildly impaired).

Finally, although Dr. Onady's 2012 and 2013 treatment records repeatedly note that plaintiff was "frustrated, angry or irritable," the ALJ reasonably considered the treatment records as a whole and found they reflected that plaintiff experienced periods of increased stress due to external factors in her life but her mental condition and functioning did not change significantly over time. (Tr. 503). The ALJ's finding in this regard is substantially supported by Dr. Onady's reports that plaintiff's condition did not change significantly over the course of her

20

treatment from one visit to the next; the lack of any changes in plaintiff's treatment regimen over the extended period of treatment (Tr. 492-93); the testimony of the medical expert, Dr. Buban, that such findings were linked to "psychosocial stressors" and did not reflect significant difficulty getting along with people in the general environment (Tr. 543); and Dr. Onady's notes elaborating on her findings of frustration, anger and irritability. *See* Tr. 262, 1/5/12- "Frustrated with not finding a job and financial stress"; Tr. 378, 1/2/13- "[Plaintiff] very upset about poor relationship with children and finances are difficult, poor sleep, increased anxiety and depression and increased irritability"; Tr. 394, 3/5/13 - "[Plaintiff] very depressed about her relationship with fiancé and step father's cancer, worried about finances, discouraged about not being able to work[.] Very irritable and angry"; Tr. 365, 5/1/13 - "[Plaintiff] reports she is overwhelmed with stepdad's cancer and mother needing her. Dealing with bankruptcy and son's divorce. Mood dysphoric, and irritable and hyperverbal.").[8]

Plaintiff further alleges that the ALJ erroneously rejected Dr. Onady's opinions based on her purported failure to alter plaintiff's medications when in fact Dr. Onady did make medication changes. The Court disagrees. The record shows that Dr. Onady changed plaintiff's medications a handful of times over the extended course of her treatment. It appears that new

---

[8] There are similar notations in Ms. Turner's records in later 2015 and throughout 2016, well beyond the date last insured. *See,* e.g., Tr. 934, 10/20/15 - angry/irritable, apprehensive, she "expressed feeling angry about her relationship with her father'; Tr. 928-29, 11/23/15 - angry/irritable, plaintiff "reported she was angry that she, her mother and aunts had planned a trip for the holiday" and her niece had asked to join the group since a young female cousin was also going; Tr. 920-21, 2/01/16- angry/irritable, plaintiff reported "she was very wary of the return of her stepson into her and her husband's life" because he was a heroin user and plaintiff became anxious when he was around or when her husband became stressed; Tr. 903, 8/9/16 - angry/irritable, stressor was not having activities to get involved in during the summer; Tr. 901, 8/23/16 - angry/irritable, depressed, plaintiff reported that her mood was improved due to going out shopping and to eat with her husband, she realized she was angry due to not being able to go to Graceland as she and her husband had planned, she reported she had contacted some of her husband's relatives over the past year and told her husband it would be nice to go to Kentucky where they are both from to visit relatives; Tr. 898, 9/6/16 - mood angry/irritable, apprehensive, depressed, plaintiff reported she was "angry and depressed" which she attributed to her son's marital troubles, she reported she was "very happy over the holiday weekend due to being able to spend time with her grandchildren and take them on an outing."

prescriptions for Lamictal and Klonopin were added in October 2011 or January 2012 (Tr. 261, 263, 325, 339-40); Cymbalta was added one year later in December 2012 (Tr. 379); and Lamictal was discontinued at some point and added again in January 2013 (*Id*.). Rather than supporting a finding of disability, the fact that plaintiff's medications were altered so seldom during the period of alleged disability suggests that plaintiff's symptoms were effectively managed with the medications as prescribed. Dr. Onady's failure to change plaintiff's prescribed medications on all but a few isolated dates supports the ALJ's finding that plaintiff's condition was stable and did not impose debilitating limitations.

Finally, plaintiff alleges that it was inconsistent for the ALJ to give the opinion of Dr. David Chiappone, Ph.D., "significant general weight" but to discount Dr. Onady's opinions. Plaintiff notes that in its prior decision, this Court found that Dr. Onady's assessments were consistent with each other and were "not inconsistent" with Dr. Chiappone's assessment that plaintiff would have difficulty in remembering information over time, with concentration, persistence and pace to perform simple tasks, in dealing with coworkers and supervisors, and in responding appropriately to work pressures in a work setting. (Tr. 620-25, citing Tr. 306-07). Plaintiff argues that because the opinions are "not inconsistent," it was inherently contradictory for the ALJ to credit Dr. Chiappone's assessment while rejecting Dr. Onady's opinions. (Doc. 10 at 10, citing Tr. 501-02; *Allen v. Comm'r*, No. 3:13-cv-352, Doc. 15 at *16 (Report and Recommendation) (S.D. Ohio Dec. 15, 2014)).

The Court disagrees with plaintiff's position. Dr. Chiappone opined that plaintiff would have some difficulty remembering information over time; difficulty maintaining attention and concentration over time; some difficulty dealing with co-workers and supervisors, and difficulty dealing with stress on a job. (Tr. 307-08). It was not inconsistent

22

for the ALJ to find that plaintiff had some limitations in these areas as Dr. Chiappone opined and to also find that the degree of impairment was not extreme or marked. *See Burton v. Comm'r of Soc. Sec.*, 690 F. App'x 398, 402 (6th Cir. 2017) (treating physician's opinion that "the plaintiff had 'no ability' to interact in in social settings, even though contemporaneous notes reflected stable functioning . . . deviates from other more moderate positions concluding that [the plaintiff] had only 'some difficulty' in mental functioning."). Nothing in this Court's decision on plaintiff's prior appeal of her claim requires a different result. Nor is the ALJ's finding precluded by the decision in *Allen*, No. 3:13-cv-352. The Court in *Allen* found that an ALJ erred in weighing the medical-source opinions because he failed to explain why he credited the opinions of non-examining mental health sources as to some mental work restrictions but not others, resulting in an "unexplained incongruity" in the ALJ's decision. (*Id*. at 14-16). The ALJ did not commit a similar error here. Rather, the ALJ "rejected a treating physician's opinion in a manner that was consistent with the Regulations, then tailored an assessment of the plaintiff's residual functional capacity with lesser restrictions." *Id*. at 16 (distinguishing *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 197 (6th Cir. 2004)). The ALJ gave valid reasons for affording Dr. Onady's opinions less than controlling weight and only "some weight." The ALJ's reasons are substantially supported by the record.

Plaintiff's first assignment of error should be overruled.

## 2. The weight to the non-examining psychologists

Plaintiff alleges as her second assignment of error that the ALJ erred by failing to adequately weigh the opinions of the state agency reviewing psychologists. (Doc. 10 at 10-13). Plaintiff argues that the ALJ did not mention the factors of supportability, consistency, and specialization when weighing their opinions and did not meaningfully explain why the opinions

23

were entitled to significant weight; the ALJ appears to have misapprehended this Court's prior Order, which directed the ALJ to address the limitations assessed by these sources, as requiring the ALJ to credit the opinions on remand; and the ALJ does not appear to have applied the same level of scrutiny to their opinions as she applied to Dr. Onady's opinions, which is the inverse of what the regulations require.   (*Id.* at 11-12, citing *Gayheart*, 710 F.3d at 379).

Non-examining psychologists Hill and Finnerty reviewed the record in October and December 2012.   They determined that plaintiff was mildly restricted in activities of daily living; she had moderate difficulties in maintaining social functioning; she had moderate difficulties in maintaining concentration, persistence or pace; and she had no episodes of decompensation.   (Tr. 78, 92).   Dr. Hill limited plaintiff to 1-4 step tasks without multi-tasking or strict time limitations, with only superficial interactions, in a setting in which changes in routine are infrequent and routines are relatively static.   (Tr. 82-83).   Dr. Finnerty limited plaintiff to simple tasks without fast pace and superficial interactions with others, performed in a static setting without frequent changes.   (Tr. 96-98).

In addressing the medical opinion evidence, the ALJ acknowledged that plaintiff's claim had been remanded for the ALJ to "address the limitations set forth by the State Agency psychological consultants and engage a medical expert to review all medical and opinion evidence, and reassess the [plaintiff's] residual functional capacity."  (Tr. 501).   The ALJ gave "significant general weight" to the reviewing psychologists' opinions on remand but with some modification of the restrictions they assessed.   (Tr. 501).   The ALJ limited plaintiff to simple, repetitive tasks that are considered low stress, i.e., "work without strict production quotas or fast pace, and only routine, static work with few changes in the work setting," and to "occasional contact with coworkers, supervisors and the public."   (Tr. 497).   The ALJ thoroughly explained

24

in her written opinion why the functional restrictions assessed by the state agency reviewing psychologists were consistent with the record, and the ALJ's decision to incorporate those restrictions into the RFC finding is substantially supported by the record.

The ALJ found that the record confirmed that plaintiff's mental functioning was reduced as a result of anxiety, depression and personality disorders and symptomatology, including some irritability from stressors such as her inability to find a job, financial concerns and family issues. (Tr. 498). However, the ALJ found the treatment records and consultative examining psychologist Dr. Chiappone's evaluation and test results did not show the degree of impairment was marked. Plaintiff's symptoms were never so severe as to lead her to "seek or require inpatient treatment," and her symptoms did not prompt changes in her treatment regimen. Further, plaintiff's completion of a Bachelor of Science degree in criminal justice during the first year of alleged disability was consistent with both Dr. Buban's testimony and the state agency reviewing psychologists' opinions that plaintiff's ability to remember information over time was not significantly impaired. (Tr. 498-99). In addition, though plaintiff reported anger and frustration with others and the treatment records noted irritability, she attended church regularly, acted as caregiver for her terminally ill stepfather for four months, and maintained a stable relationship with her husband. (Tr. 499). The ALJ accounted for plaintiff's reduced mental functioning by adopting the reviewing psychologists' restriction to "low stress work," defined as "work that does not involve strict production quotas or fast pace, and which is considered routine, static work with few changes in the work setting." (*Id*.). To account for her reports of anger and frustration with others and the reports of irritability reflected in the treatment notes, the ALJ adopted a slightly modified restriction to occasional contact with coworkers, supervisors and the public. The ALJ's finding of less than marked impairment and of reduced mental

25

functioning consistent with the state psychologists' assessments is substantially supported by the record and by the ALJ's reasons for the weight assigned the mental health providers' opinions. *Gayheart* does not compel a different result as the record is consistent with the ALJ's findings and the ALJ correctly applied the law. *See Burton*, 690 F. App'x at 402 ("*Gayheart* reversed and remanded because the ALJ did not provide good reasons for deviating from treating-source opinions when other record evidence had 'equivalent inconsistencies.'").

Plaintiff's second assignment of error should be overruled.

### 3. The weight to the testimony of the medical expert, Dr. Buban

Plaintiff alleges as her third assignment of error that the ALJ improperly weighed the testimony of the medical expert, Dr. Buban. (Doc. 10 at 12-13). The ALJ gave Dr. Buban's opinion "significant weight" on the grounds it was based on all of the relevant medical evidence, her opinion was consistent with that evidence, and her testimony was reasonable and consistent with the documented clinical findings, objective testing, and reported activities of daily living noted throughout the relevant record. (Tr. 504).

Plaintiff contends that the ALJ's finding that Dr. Buban's testimony is consistent with the evidence is not supported by the record. First, plaintiff alleges that while Dr. Buban "endorsed" that there were few abnormalities documented by plaintiff's treating mental health providers which could support Dr. Onady or Dr. Chiappone's opinions, the evidence shows otherwise.[9] (Doc. 10 at 12, citing Tr. 529-44). Second, plaintiff alleges that this Court previously made findings indicating that Dr. Buban's findings are inconsistent with the treatment records. (Doc. 10 at 12, citing Tr. 639). Specifically, the Court found that the "treatment notes repeatedly

---

[9] Plaintiff concedes that Dr. Buban did not testify as to whether she agreed with Dr. Onady or Dr. Chiappone's opinions. (Doc. 10 at 12).

reflect Plaintiff's dysphoric mood, irritability, poor sleep, increased anxiety and depression, inability to get along with others, isolating, pressured/rapid speech, being overwhelmed, and being hyperverbal." (Tr. 639). Finally, plaintiff indicates that Dr. Buban's testimony is inconsistent with Dr. Chiappone's opinion that plaintiff "would have some difficulty understanding, remembering, and carrying out instructions," which this Court previously determined was based upon objective test results; i.e., plaintiff's "inability to remember any of three objects and her ability to spell a word forwards but inability to focus on spelling the word backwards." (Tr. 646). Plaintiff argues that by failing to discuss or identify these discrepancies between Dr. Buban's testimony and the records she reviewed, the ALJ erroneously applied less scrutiny to Dr. Buban's opinion than she applied to Dr. Onady's opinions. (*Id*. at 12-13, citing *Gayheart*, 710 F.3d at 380).

In its prior decision on appeal, this Court noted that the treatment records included a number of abnormal findings; however, the Court also found that the record contained "evidence that undermines Plaintiff's alleged limitations, including her mental health treatment and activity level." (Tr. 648-49). The Court ordered the ALJ on remand to engage a medical expert to review all of the medical evidence and medical opinions. (Tr. 650). The ALJ elicited Dr. Buban's testimony on remand in compliance with the Court's Order. Dr. Buban testified at the ALJ hearing that during the time period at issue, plaintiff would not have met or equaled a listing. (Tr. 532). Dr. Buban opined that plaintiff had mild restrictions in her ability to interact with others based on her complaints about depression and anxiety in the treatment notes (Tr. 533-34); mild to moderate limitations in concentration, persistence and pace, which takes into account periods when plaintiff is "more symptomatic," based on the results of Dr. Chiappone's objective memory assessment, on which plaintiff did "fairly well" (Tr. 534); and mild to

27

moderate ability to adapt and manage herself based on records showing she has lived independently and maintained all of the activities of daily living, but with some emotional reactivity primarily with family members. (Tr. 535). Dr. Buban testified that plaintiff was not limited in the area of understanding, remembering, and applying information. (Tr. 533). Dr Buban indicated that plaintiff was restricted to performing work at a normal pace and was limited to no "fast-paced, production quota type work" to account for her restrictions in concentration, persistence and pace, and that she was restricted to a "low stress, normal, work stress environment without high demands" to account for her mild to moderate limitations in her ability to adapt and manage herself. (Tr. 535). Dr. Buban testified she did not see where the treatment records reflected "specific limitations caused by mental illness" as opposed to "psychosocial situations." (Tr. 540-41). Dr. Buban also noted that there had not been a need for more intensive treatment. (Tr. 542).

Dr. Buban thoroughly explained the bases for her opinion that plaintiff had only mild to moderate restrictions of her mental functioning. Dr. Buban testified that from 2008 through 2011, plaintiff's focus was on finding a job, she was frustrated that she had not found a job and was concerned about financial issues, and most of her depression was related to her difficulties in finding a job. (Tr. 532). Dr. Buban also noted that according to the records, plaintiff completed her schooling during this time period. (*Id*.). Dr. Buban testified that the records did not show that plaintiff suffered debilitating restrictions caused by mental illness as opposed to fluctuating symptoms and mood related to "psychosocial situations," and her regular visits to Dr. Onady every three months without the need for more intensive treatment were not consistent with debilitating limitations. (Tr. 541-42).

28

Plaintiff argues that Dr. Buban's testimony is inconsistent with the mental status abnormalities documented in Dr. Onady and Ms. Turner's notes. (Doc. 10 at 12). Plaintiff cites numerous records generated by Dr. Onady and Ms. Turner prior to the date last insured reporting that plaintiff's mood was dysphoric. (Dr. Onady- Tr. 365, 5/1/13; Tr. 447, 7/15/13; Tr. 507, 10/3/13; Tr. 408, 2/4/14; Ms. Turner- Tr. 386, 1/29/13; Tr. 390, 2/7/13; Tr. 372, 3/8/13; Tr. 357, 5/9/13; Tr. 355, 5/16/13; Tr. 436, 6/18/13 ("mood moderately depressed"); Tr. 469, 10/3/13; Tr. 519, 11/21/13; Tr. 429, 12/4/13; Tr. 420, 1/13/14). Dr. Onady and Ms. Turner documented other abnormal findings in these records. (Dr. Onady- Tr. 365, 5/1/13- "irritable and hyperverbal"; Tr. 447, 7/15/13- mood also anxious; Tr. 507, 10/3/13- mood also anxious; Tr. 408, 2/4/14- mood also anxious and "reports she gets easily agitated"; Ms. Turner- Tr. 386, 1/29/13- affect congruent, tearful; Tr. 372, 3/8/13- mood also grieving, sad; Tr. 357, 5/9/13- affect tearful; Tr. 436, 6/18/13- demeanor moderately preoccupied, activity mildly slowed, attention/concentration mildly impaired; Tr. 519, 11/21/13- affect melancholy, angry; Tr. 429, 12/4/13- affect angry; Tr. 420, 1/13/14- affect angry).

The ALJ did not err by crediting Dr. Buban's opinions despite these abnormal findings. Dr. Buban acknowledged that Dr. Onady's treatment records included findings related to depression and anxiety, and occasionally other symptoms, but Dr. Buban testified the treatment records did not include "detailed" mental status examinations. (Tr. 532). Dr. Buban testified that Dr. Onady consistently indicated that mental status examination findings were unchanged, and it was not clear from the treatment notes whether certain symptoms were observations made by Dr. Onady or symptoms reported by plaintiff. (Tr. 537). Dr. Buban also testified that the treatment notes did not mention "impulsivity, memory problems and paranoia"; the treatment records did not include an objective assessment of memory; the only objective memory

29

assessment had been performed by consultative examining psychologist Dr. Chiappone; and the treatment records indicated plaintiff had average, or possibly low, intellectual ability which would not impose significant limitations. (Tr. 532-33). In light of these discrepancies and gaps in the treatment records, the ALJ reasonably rejected the extreme and marked limitations assessed by Dr. Onady in favor of the mild to moderate restrictions imposed by Dr. Buban.

Plaintiff's third assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be **CLOSED** on the docket of the Court.

Date: <u>November 16, 2018</u>                    <u> s/ Karen L. Litkovitz        </u>
                                        Karen L. Litkovitz
                                        United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TANYA MILLER,         Case No. 1:17-cv-633
   Plaintiff,          Dlott, J.
                Litkovitz, M.J.


   vs.


COMMISSIONER OF
SOCIAL SECURITY,
   Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

 Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).